2020 IL App (1st) 190320

FIRST DISTRICT
FOURTH DIVISION
June 18, 2020

No. 1-19-0320

| | | |
|---|---|---|
| NINE GROUP II, LLC, SY VEGAS PARTNERS, LLC, LAWRENCE SILVER, and ALAN YOUNG, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 13 CH 25124 |
| LIBERTY INTERNATIONAL UNDERWRITERS, INC., | ) ) ) | Honorable |
| Defendant-Appellee. | ) ) | Franklin U. Valderrama, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs Nine Group II, LLC (Nine Group II), SY Vegas Partners, LLC (SY Vegas),

Lawrence Silver (Silver), and Alan Young (Young) filed an action in the circuit court of Cook

County against defendant-insurer Liberty International Underwriters, Inc. (Liberty) following

Liberty's denial of the plaintiffs' claim under a directors and officers (D&O) insurance policy.

The circuit court denied the parties' cross-motions for summary judgment on the plaintiffs'

breach of contract claim and granted partial summary judgment in favor of Liberty on the

plaintiffs' claim that Liberty acted in bad faith under section 155 of the Illinois Insurance Code

(215 ILCS 5/155 (West 2012)).  On appeal, the plaintiffs contend that the circuit court erred in

granting partial summary judgment.  For the reasons discussed herein, we affirm.

¶ 2                                   BACKGROUND

¶ 3                          The Parties and the Underlying Transaction

¶ 4     The verified complaint provides, in part, as follows.  Nine Group II was a Delaware limited liability company with its principal place of business in Chicago.  Nine Group II's membership was comprised of multiple investors, including SY Vegas; SY Vegas was managed by Silver and Young.  SY Vegas became the manager of Nine Group II following the resignation of its prior manager in late 2010.  B In It LLC (BII) – owned by David Blumenfeld (Blumenfeld) – also held a membership interest in Nine Group II.  SY Vegas held approximately 44% and BII held approximately 2% of the Class B membership interests in Nine Group II.

¶ 5     Nine Group II held 50% of the outstanding equity in N-M Ventures II, LLC (NMV II), a company which owned and operated several entertainment venues located in the Palms Hotel in Las Vegas.  F.P. Holdings, L.P. (FPH) owned the other 50% membership interest in NMV II, which was managed by George Maloof.

¶ 6     In early 2012, Nine Group II – through Silver and Young, as managers of SY Vegas – commenced discussions with FPH concerning the potential purchase of Nine Group II's membership interest in NMV II.  Blumenfeld expressed dissatisfaction with various proposed terms for the sale, including the purchase price.[1]  Nine Group II, FPH and other entities entered into an Interest Purchase Agreement (the original agreement) dated August 3, 2012, regarding the sale of Nine Group II's interest in NMV II to FPH and other matters.

¶ 7     On August 24, 2012, before the anticipated closing date of the original agreement, Justin Jones (Jones), an attorney representing Blumenfeld and other minority investors, sent an email to Silver regarding the "recent buyout offer and negotiations" relating to Nine Group II.  The email

_____

[1] The plaintiffs alleged, on information and belief, that Blumenfeld independently (and unsuccessfully) attempted to negotiate a sale of his membership interest in Nine Group II to FPH.

set forth six "key terms of any agreement regarding a buyout of their interest in Nine Group II." Jones stated that if a satisfactory agreement was not reached, "we will have no choice but to pursue this matter through litigation." Jones sent a follow-up email clarifying certain points on the same date.

¶ 8　　Based on various concerns – including issues involving FPH's lender, Wells Fargo – the original agreement was terminated on or about August 25, 2012. An Amendment to the Interest Purchase Agreement (the amended agreement) was entered into as of September 6, 2012, and the transaction closed shortly thereafter. Although the purchase price and other key terms were modified, a "reaffirmation" provision in the amended agreement stated that the original agreement otherwise continued to be in full force and effect and was ratified by the parties. Pursuant to the amended agreement, FPH purchased Nine Group II's interests in NMV II. Nine Group II distributed most of the consideration from the sale to its members, including Blumenfeld.

¶ 9　　　　　　　　　　　　The Insurance Policy

¶ 10　　As part of the transaction, FPH agreed to provide indemnification to Nine Group II against essentially all claims except those relating to the consideration paid to the company for the sale of its membership interests in NMV II. With the assistance of its broker, Mesirow Financial, Nine Group II also applied for a D&O policy with Liberty. The policy issued by Liberty provided, in relevant part, for "Directors & Officers and Company Liability" insurance on a claims-made basis for a policy period of August 27, 2012 to August 27, 2013.

¶ 11　　In an email sent on September 18, 2012, with the subject line of "[p]otential demand," the plaintiffs' attorney forwarded the Jones emails from August 24 to two Mesirow employees. The email from plaintiffs' counsel stated, in part: "After speaking with your colleague today, we

realized the following" – *i.e.*, the Jones emails – "could potentially be construed as a demand from certain members of the [N]ine [G]roup." Mesirow responded that the Jones emails could possibly constitute notice of a potential claim and thus opined that it would be "prudent" to inform Liberty.

¶ 12    On or about October 17, 2012, based on Mesirow's recommendation, SY Vegas sent notice to Liberty notifying the insurer of the August 24 emails and Blumenfeld's subsequent "assertions and threats." Liberty acknowledged receipt of the letter on October 19, 2012 and indicated it would contact the plaintiffs' attorney but apparently did not do so at that time.

¶ 13                                    Blumenfeld's Lawsuit

¶ 14    On March 15, 2013, Blumenfeld (through BII) filed a lawsuit in the District Court of Clark County, Nevada, captioned *B In It, LLC, Individually and Derivatively as Nominal Plaintiff on Behalf of Real Party in Interest, Nine Group II, LLC v. SY Vegas Partners, LLC, Larry Silver, Allan Young, and George Maloof*, Case No. A-13-678463-B. Nine Group II was listed as a nominal defendant. The complaint asserted claims for, among other things, breach of fiduciary duty, minority member oppression, breach of the covenant of good faith and fair dealing, and civil conspiracy; Blumenfeld also sought declaratory relief and an accounting. In addition to direct claims, Blumenfeld purportedly brought derivative claims on behalf of Nine Group II. Certain of the claims were based on alleged events prior to SY Vegas's management of Nine Group II. Other claims were based on the operations of the Las Vegas venues, as well as the sale of Nine Group II's membership interests in NMV II.

¶ 15    The plaintiffs herein and BII eventually settled the lawsuit in 2016. The settlement agreement expressly provided it was not intended to affect the claims asserted by the plaintiffs in its Illinois litigation against Liberty (described below).

¶ 16                                    Liberty's Investigation and Decision

¶ 17     The plaintiffs herein notified Liberty of the initiation of the Nevada litigation. Nine Group II sent written notice to Liberty on March 28, 2013 and again on April 19, 2013, *i.e.*, both before and after service of the Nevada complaint. Nine Group II also sent notice to FPH, which later denied any obligation to indemnify based on FPH's interpretation of their agreement.

¶ 18     The record includes emails between plaintiffs' counsel and Gia Cavellini Guzman (Guzman), an attorney who worked as a complex claims specialist for Liberty. The emails reflect that Guzman and the plaintiffs' counsel participated in a telephone call on April 24. On the following day, the plaintiffs' counsel emailed background materials to Guzman, including an organizational chart for NMV II, Nine Group II's operating agreement, the original agreement, and the amended agreement. On May 6, 2013, Guzman requested additional details regarding the transaction with FPH and other matters; such information was promptly provided.

¶ 19     In a letter from Guzman dated June 11, 2013, Liberty advised the plaintiffs' counsel that there was no coverage available under the D&O policy for the Nevada litigation. Liberty indicated that the allegations in the Nevada complaint and the August 24, 2012 emails from attorney Jones reflected that the claim arose prior to the policy period, which had commenced on August 27, 2012. Liberty also noted, in part, that (a) the plaintiffs would not have sustained a "loss" for coverage purposes to the extent FPH provided indemnification, (b) a policy exclusion which eliminated coverage for "wrongful acts" potentially applied, and (c) certain of Silver's answers on the insurance application appear to have been not materially true and accurate.

¶ 20     In a letter to Guzman dated June 17, 2013, the plaintiffs' attorney detailed various "misunderstandings" in Liberty's coverage denial letter and "inaccuracies" in the Nevada complaint. The plaintiffs asserted in part, that the potential litigation referenced in the Jones

emails related to the disposition of the membership interests of certain investors (including Blumenfeld) in Nine Group II, and not the sale of Nine Group II's assets – which the plaintiffs' attorney characterized as "*two entirely different causes of action*" (emphasis in original). The plaintiffs also posited that the six-month gap between Jones' emails in August 2012 and the Nevada lawsuit in March 2013 suggested the "eventual litigation filed was unrelated to the threats made by investors in the August 24, 2012 email."

¶ 21                              The Plaintiffs' Complaint Against Liberty

¶ 22    On November 6, 2013, the plaintiffs filed a verified complaint in the circuit court of Cook County against Liberty, as well as FPH and two individuals affiliated with FPH – Michael Connolly (Connolly) and Peter Nolan (Nolan). The counts against FPH, Connolly, and Nolan – counts I, III, and VI – were eventually dismissed. In count II against Liberty, the plaintiffs sought a declaration that they are entitled to coverage and indemnification from Liberty for the Blumenfeld claims. In count IV, the plaintiffs alleged that Liberty breached the insurance contract by refusing to provide coverage and indemnification. In count V – a "bad faith" count against Liberty – the plaintiffs alleged that the insurer's conduct was "vexatious and unreasonable" because it failed to properly investigate Blumenfeld's claims, delayed in considering the plaintiffs' request for coverage, refused to promptly respond to inquiries from the plaintiffs, and denied coverage without a reasonable basis for doing so.

¶ 23                                  Summary Judgment Motions

¶ 24    In September 2017, the plaintiffs filed a motion for summary judgment as to the remaining counts to the complaint: count II (declaratory relief), count IV (breach of contract), and count V (bad faith). The attachments to the motion included select pages of the deposition testimony of (a) Silver; (b) Young; (c) Guzman; (d) Liberty's corporate representative, John Van

Amburg (Van Amburg); and (e) Craig Goesel, a senior managing director at Mesirow, the insurance broker. Young testified that the transaction pursuant to the amended agreement was a "[d]ifferent deal" with "totally different terms" than the original agreement executed one month earlier. Guzman testified, in part, that she did not recall reaching out to the underwriter on the D&O policy or communicating with Mesirow regarding the plaintiffs' claim. When asked if there was an "aspirational period of time" between notice of a claim and Liberty's coverage determination, Van Amburg answered that Liberty typically would want to make a coverage determination within 30 days, but he noted that such "benchmark" may not be possible based on a lack of information or cooperation from an insured.

¶ 25    Liberty filed a response in opposition to the plaintiffs' motion for summary judgment and a cross-motion for summary judgment. Liberty contended: a policy exclusion precluded coverage because the Nevada litigation was based on or attributable to substantially the same facts as Blumenfeld's claim which was made through his counsel on August 24, 2012; Nine Group II had an indemnification right from FPH and thus had no "loss" under the policy; false information was provided in Nine Group II's insurance application; and the allegations raised in the Nevada litigation were not covered under the policy pursuant to the "known loss doctrine" where Nine Group II knew or had reason to know there was a substantial probability that they would suffer a loss in relation to Blumenfeld's claims prior to the inception date of the policy. Liberty also argued that bad faith did not exist because there was a "bona fide" coverage dispute.

¶ 26    The attachments to Liberty's response and cross-motion for summary judgment included the full depositions of Silver, Young, Goesel, and Guzman. The attachments also included emails between the parties in July 2013 to schedule a telephone call regarding the plaintiffs' June 17 letter responding to Guzman's coverage denial. In response to a July 29, 2013 email

from Guzman, the plaintiffs' attorney had provided a brief update regarding the status of the Nevada litigation.

¶ 27                                Circuit Court's Rulings

¶ 28     The circuit court granted the plaintiffs' motion for voluntary dismissal of count II – the declaratory judgment count.  As to the two remaining counts, the circuit court (a) denied the parties' cross-motions for summary judgment on count IV (breach of contract) and (b) granted Liberty's motion and denied the plaintiffs' motion for summary judgment on count V (bad faith).

¶ 29     The plaintiffs filed a motion to reconsider the court's rulings as to count V; in the alternative, the plaintiffs sought a Rule 304(a) finding (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)). The circuit court entered a memorandum opinion and order on January 18, 2019, denying the motion to reconsider and granting the motion for a Rule 304(a) finding.  As to the motion to reconsider, the circuit court reaffirmed its prior holding that Liberty "met its burden as a matter of law that there was a bona fide coverage dispute, and that there was no question of fact as to whether Liberty's denial for claim coverage was reasonable[2] or vexatious."  As to the Rule 304(a) finding, the circuit court acknowledged that an immediate appeal could result in significant delay, but opined that a delayed appeal could result in additional expense as the parties may have to re-litigate the bad faith claim.  The plaintiffs filed this timely appeal.

¶ 30                                ANALYSIS

¶ 31     The plaintiffs contend on appeal that the circuit court erred when it granted Liberty's motion for summary judgment as to the plaintiffs' claim that Liberty denied coverage in bad faith pursuant to section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2012)). Specifically, the plaintiffs argue that: (a) the circuit court erroneously ruled there was a *bona fide* dispute regarding coverage; (b) Liberty's failure to adequately communicate or to timely

---

[2] We believe that the circuit court intended to write "unreasonable," not "reasonable."

investigate the claim violated its own policies and constituted bad faith; and (c) genuine issues of material fact exist as to whether Liberty denied coverage in bad faith.

¶ 32                                    Standard of Review

¶ 33    As a preliminary matter, we note that the parties disagree regarding the standard of review. The plaintiffs contend we should review the summary judgment rulings on their section 155 claim *de novo*. Liberty asserts that the standard of review is abuse of discretion. As discussed below, we are persuaded by the plaintiffs' arguments regarding the standard of review.

¶ 34    Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). See also 735 ILCS 5/2-1005 (West 2016) (stating that "judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). A genuine issue of material fact exists where the facts are disputed or where reasonable minds could draw different inferences from the undisputed facts. *GreenPoint Mortgage Funding, Inc. v. Hirt*, 2018 IL App (1st) 170921, ¶ 17. Summary judgment is a drastic measure and should be granted only if the movant's right to judgment is free and clear from doubt. *Outboard Marine*, 154 Ill. 2d at 102. In appeals from summary judgment rulings, our review is *de novo*. *Id*. "*De novo* consideration means the reviewing court performs the same analysis that a trial judge would perform." *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, ¶ 117.

¶ 35    In contrast to the *de novo* standard applicable in the summary judgment context, courts generally apply an abuse of discretion standard when reviewing a circuit court's decision

regarding attorney fees and costs under section 155. *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 29; *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 68. A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *Id.*

¶ 36 The instant case involves the intersection of the foregoing scenarios – an appeal from a summary judgment ruling on a section 155 claim. When considering the disposition of a section 155 claim through summary judgment, certain Illinois courts have applied an abuse of discretion standard of review. For example, in *John T. Doyle Trust v. Country Mutual Insurance Co.*, 2014 IL App (2d) 121238, ¶ 29, in applying an abuse of discretion standard, the appellate court found that the trial court "drew on its knowledge of the proceedings in deciding that the facts presented did not warrant sanctions." In *Evergreen Real Estate Services, LLC v. Hanover Insurance Co.*, 2019 IL App (1st) 181867, ¶ 35, the appellate court observed that section 155 provides that the court "may" impose sanctions when it "appears to the court" that the conduct is vexatious and unreasonable, which suggests that "[w]hether to sanction a party under section 155 is an exercise that is typically replete with discretion."

¶ 37 While our supreme court in *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 160 (1999), recognized that an abuse of discretion standard generally is utilized to review a circuit court's decision to award attorney fees and costs under section 155, the *Ehlco* court applied a *de novo* standard where the circuit court granted the insured's motion for judgment on the pleadings. Applying *Ehlco* in the instant case, we must utilize the standard of review that is appropriate for a summary judgment motion; our review is thus *de novo*. *Illinois Founders Insurance*, 2015 IL App (1st) 122481, ¶ 29. Accord *Central Illinois Compounding,*

*Inc. v. Pharmacists Mutual Insurance Co.*, 2018 IL App (3d) 170809, ¶ 10; *Green4All Energy Solutions v. State Farm Fire & Casualty Co.*, 2017 IL App (1st) 162499, ¶ 21; *Edwards v. State Farm Insurance Co.*, 2012 IL App (1st) 112176, ¶ 5; *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 88 (2002); *Mobil Oil Corp. v. Maryland Casualty Co.*, 288 Ill. App. 3d 743, 751 (1997). We now turn to the merits.

¶ 38                              Section 155 – General Principles

¶ 39    Section 155 of the Illinois Insurance Code provides an extracontractual remedy to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits.[3] *Evergreen Real Estate Services*, 2019 IL App (1st) 181867, ¶ 36; *McGee v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 673, 680-81 (2000); *Green v. International Insurance Co.*, 238 Ill. App. 3d 929, 935 (1992). The statute provides, in pertinent part, that "[i]n any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs," plus additional amounts set forth in the statute. 215 ILCS 5/155 (West 2012).

¶ 40    The statute is intended to make lawsuits by policyholders economically feasible and to punish insurers for misconduct. *O'Connor v. Country Mutual Insurance Co.*, 2013 IL App (3d) 110870, ¶ 13; *McGee*, 315 Ill. App. 3d at 681. See also *Keller v. State Farm Insurance Co.*, 180 Ill. App. 3d 539, 556 (1989) (providing that the purpose of section 155 is "not only to aid the insured, but also to discourage insurers from profiting by their superior financial positions while

---

[3] *E.g.*, *Ehlco*, 186 Ill. 2d at 159 (stating that section 155 provides a remedy where an insurer has acted vexatiously and unreasonably in refusing to defend its insured); *West American Insurance Co.*, 334 Ill. App. 3d at 88 (noting that section 155 provides that an insured may collect attorney fees and costs where an insurer creates a vexatious and unreasonable delay in settling a claim).

delaying in the payment of contractual obligations").

¶ 41 The key question in a section 155 claim is whether an insurer's conduct is vexatious and unreasonable. *Uhlich Children's Advantage Network v. National Union Fire Co. Pittsburgh, PA*, 398 Ill. App. 3d 710, 723 (2010). "Whether a delay is vexatious and unreasonable is a question of fact that must be assessed based on the totality of the circumstances, taken in broad focus." *Cook ex rel. Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 48. Accord *West American Insurance*, 334 Ill. App. 3d at 88; *Kohlmeier v. Shelter Insurance Co.*, 170 Ill. App. 3d 643, 659 (1988). No single factor – *e.g.,* the length of time or the amount of money involved – is controlling. *Cook*, 2014 IL App (1st) 123700, ¶ 48. In examining the circumstances, courts have considered the insurer's attitude, whether the insured was forced to file suit to recover, and whether the insured was deprived use of its property. *Id.* See also *Rosalind Franklin University of Medicine & Science v. Lexington Insurance Co.*, 2014 IL App (1st) 113755, ¶ 110 (noting that the insurer's "attitude" must be examined). "Additional considerations include whether there is a *bona fide* dispute concerning coverage, the extent of the insurance company's evaluation and investigation of the claim, and the adequacy of communications between the insurance company and the insured." *Cook*, 2014 IL App (1st) 123700, ¶ 48.

¶ 42 The plaintiffs contend that Liberty's refusal to provide coverage for the Nevada litigation was vexatious and unreasonable under section 155. According to the plaintiffs, the circuit court erred in (a) ruling there was a *bona fide* dispute regarding coverage, (b) denying coverage where Liberty allegedly failed to adequately investigate the claim or communicate with the plaintiffs, and (c) granting summary judgment where there are genuine issues of material fact. We discuss each argument in turn below.

¶ 43                                      *Bona Fide* Dispute

¶ 44    Section 155 costs and sanctions are inappropriate when a *bona fide* dispute regarding coverage exists.  *Cook*, 2014 IL App (1st) 123700, ¶ 49.  "*Bona fide*" is defined as "[r]eal, actual, genuine, and not feigned."  *McGee*, 315 Ill. App. 3d at 683 (citing Black's Law Dictionary 177 (6th ed. 1990)).  Where an insurer reasonably relies upon evidence sufficient to form a *bona fide* dispute, the insurer has not acted unreasonably and vexatiously under section 155.  *Illinois Founders Insurance*, 2015 IL App (1st) 122481, ¶ 32.  Accord *Charter Properties, Inc. v. Rockford Mutual Insurance Co.*, 2018 IL App (2d) 170637, ¶ 30; *Morris v. Auto-Owners Insurance Co.*, 239 Ill. App. 3d 500, 506 (1993).

¶ 45    Liberty indicated that its coverage denial was based, in part, on the fact that the allegations in the Nevada complaint and the August 24, 2012 emails from attorney Jones reflected that the claim arose prior to the policy period, which commenced on August 27, 2012. The plaintiffs contend that "the undisputed facts are clear" that the Nevada litigation was covered by the policy.  As discussed below, we reject the plaintiffs' contentions and find that a *bona fide* coverage dispute exists.

¶ 46    The D&O policy states that coverage applies only to claims that are first made against the insured during the policy period.  The one-year policy period commenced on August 27, 2012. Three days before the policy period, Jones sent an email to Silver on behalf of Jones' clients – including Blumenfeld – setting forth six "key terms of any agreement regarding a buyout of their interest in Nine Group II."  Jones indicated that he was retained to represent his clients "with regards to the recent buyout offer and negotiations relating to Nine Group II, LLC."

¶ 47    The plaintiffs contend that the Jones email "did not relay any demands or request any terms for Nine Group II's sale of its interests in [NMV II] to FPH," but rather was an attempt to

obtain a buyout of BII's interest in Nine Group II. The record on appeal, however, suggests otherwise. When the plaintiffs' attorney forwarded the Jones emails to the broker (Mesirow), he wrote that "[t]he 'demand' below is for a different transaction (12 Million over three years vs. 10.5 million paid in one lump sum), but a demand nonetheless." The $12 million amount was the aggregate purchase price for the transactions set forth in the original agreement; the amended agreement provided for a $10.5 million purchase price. The plaintiffs' attorney thus acknowledged being on notice that the Jones email was a potential "demand" arising from the sale of Nine Group II's interest in NMV II – which was addressed by both the original agreement and the amended agreement. Furthermore, the use of the word "demand" by plaintiffs' counsel – and counsel's efforts to reach out to Mesirow regarding the import of the Jones email – suggests, at a minimum, the plaintiffs' acknowledgment of a potential coverage issue. Although the plaintiffs argue on appeal these communications do not constitute party or judicial admissions, we need not make any such determinations for purposes of our analysis.

¶ 48    The complaint in the Nevada litigation alleged, in part, that SY Vegas, Silver, and Young sold Nine Group II's membership interest in NMV II without Blumenfeld's consent and in a transaction that was not the result of arm's length negotiation, and Silver and Young personally profited from the sale at the expense of the Nine Group II members. The plaintiffs contend on appeal that the Nevada litigation alleged conduct related solely to the *amended* agreement – and not the *original* agreement – and thus fell within the policy period. The plain language of the amended agreement, however, makes clear that the parties were *amending* the original agreement, which was executed prior to the policy period. See *Trapani Construction Co. v. The Elliot Group, Inc.*, 2016 IL App (1st) 143734, ¶ 48 (noting that the primary goal when interpreting a contract is to give effect to the parties' intent as ascertained from the plain

language of the contract). Although the plaintiffs contend that the transaction contemplated by the original agreement was terminated and the amended agreement represented a substantially different deal, the plain contractual language reflects the two agreements were interrelated.

¶ 49 We are also unpersuaded by the plaintiffs' contention that BII "specifically admitted in the Nevada Litigation that it had not made any demand on Nine Group II, or related to the Nevada Litigation before [BII] filed its suit." While the plaintiffs suggest the purported admission indicates that the Jones email from August 24, 2012 did not constitute a prior demand, the language of the Nevada complaint paints a decidedly different picture: "No demand has been made upon the current management of Nine Group II to bring suit against SY Vegas, Silver, and Young because SY Vegas, as the managers and agents of Nine Group II, would have to bring suit against themselves." Blumenfeld's assessment of the probable futility in demanding that the plaintiffs sue themselves does not indicate that his counsel's communications with Silver in August 2012 were unrelated to the transaction with FPH.

¶ 50 The question at the summary judgment stage is whether Liberty had a genuine basis for disputing the policy coverage. *Illinois Founders Insurance*, 2015 IL App (1st) 122481, ¶ 34. Even assuming that the plaintiffs proffered some evidence that might arguably suggest that the Nevada litigation fell within the scope of coverage – *e.g.*, Young's deposition testimony that the transaction pursuant to the amended agreement was a "[d]ifferent deal" with "totally different terms" than the original agreement  – the grant of summary judgment is appropriate as long as the evidence before Liberty, *in total*, created a reasonable, genuine basis for dispute. See *id*. For the reasons stated above, we find there was such a basis for dispute in the instant matter.

¶ 51 In sum, section 155 sanctions are improper when a *bona fide* dispute exists, as is the case herein. *Cook*, 2014 IL App (1st) 123700, ¶ 49. Since we have determined that there was a *bona*

*fide* dispute regarding whether the Nevada litigation fell within the policy based on the coverage period, we need not address the plaintiffs' other contentions, *e.g.*, that Liberty acted unreasonably and vexatiously in denying coverage due to the plaintiffs' purported wrongful acts.

¶ 52                    Adequacy and Timing of Liberty's Investigation and Communications

¶ 53    The plaintiffs also contend that Liberty failed to adequately investigate the claim and communicate with the plaintiffs throughout the investigation process.  According to the plaintiffs, this conduct constituted bad faith and violated Liberty's own policies.  As discussed below, we are unconvinced by the plaintiffs' contentions.

¶ 54    The plaintiffs assert on appeal that "the undisputed facts established that the claims specialist could not recall any specific documents she reviewed prior to denying [the plaintiffs'] claim and had no independent recollection of the bases for the denial of coverage 'other than just reading [the Coverage Letter] out loud and regurgitating what's in the letter.' "  It is true that Guzman acknowledged during her deposition that she could not independently recall the details of the investigation or the bases for denial of the plaintiffs' claim.  By the time of her deposition in February 2017, however, Guzman was employed by a different insurance company and more than four years had passed since the events in question.  The attachments to the summary judgment motions – including the coverage denial letter and multiple email communications between Guzman and plaintiffs' counsel during the claims investigation process – demonstrate that Guzman requested and reviewed the salient documentation.[4]

¶ 55    We are unpersuaded by the plaintiffs' reliance on *Norman v. American National Fire Insurance Co.*, 198 Ill. App. 3d 269 (1990).  In *Norman*, the appellate court found an adequate basis for the trial court's award of section 155 damages where the insurer delayed in denying the

---

[4] In fact, when the plaintiffs' counsel inadvertently emailed a mislabeled attachment, Guzman questioned its relevance – indicating, at a minimum, that she had reviewed the attachment.

plaintiffs' claim based on its theory that a house fire was intentionally set, despite investigations by two disinterested parties – the local fire department and the state fire marshal's office – which had ruled out arson as a possibility. *Id.* at 306. While the plaintiffs herein focus on Guzman's inability to independently recall the details of the investigation years later, her various communications made contemporaneously with the investigation indicate there were no "major infirmities" (*id.*) with Liberty's investigation, in contrast to *Norman*.

¶ 56    These same communications belie the plaintiffs' contention that Liberty failed to communicate with the plaintiffs or their agents throughout the investigation process. Although the plaintiffs argue that Guzman did not communicate with Mesirow throughout the claims investigation, the plaintiffs offer no support for the proposition that an insurer is required to so communicate with the insureds' *broker*. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). The record reflects that Guzman communicated on multiple occasions with the plaintiffs' attorneys – both telephonically and in writing – during the investigation process. Furthermore, we observe that certain questions emailed by Guzman to the plaintiffs' attorneys in May 2013 appear to reflect her efforts to fully understand the details of the plaintiffs' claim.

¶ 57    The plaintiffs further assert that "[i]t is undisputed that Liberty failed to abide by its own policies for providing a coverage determination within 30 days or less." As noted above, when asked whether there was an "aspirational period of time" within which Liberty makes a claim determination, Van Amburg responded: "Sure. Typically, you would want to have, you know, a coverage determination within 30 days or less. That might not always be possible given the information or lack thereof relating to the claim and the cooperation of the insured but that is a benchmark that we typically would aim for, if not better." Simply put, Van Amburg's testimony did not suggest that Liberty's failure to make a coverage decision within 30 days "violated

Liberty's own stated policies," as the plaintiffs contend. Furthermore, in light of the relative complexity of the transactions and claims at issue in this matter, we cannot find, as a matter of law, that Liberty engaged in vexatious and unreasonable conduct with respect to the timing of its coverage decision in June 2013 when the underlying complaint was served in April 2013. *Cf. Buais v. Safeway Insurance Co.*, 275 Ill. App. 3d 587, 591-92 (1995) (reversing the dismissal of a section 155 claim where the complaint alleged that the insurer waited out a 30-month period from the time of the automobile accident until the arbitrator's decision was announced, despite knowing the whole time that it would be required to pay out the full amount of the policy). In any event, where there is a *bona fide* dispute over coverage – as was the case herein— a delay in settling a claim may not violate the statute. *Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 68. Accord *Morris*, 239 Ill. App. 3d at 503 (1993); *Green*, 238 Ill. App. 3d at 935.

¶ 58    For the foregoing reasons, we reject the plaintiffs' contentions regarding the adequacy and timing of Liberty's investigation and communications.

¶ 59                          Genuine Issues of Material Fact

¶ 60    The plaintiffs also argue that, at a minimum, genuine issues of material fact exist as to whether Liberty denied coverage in bad faith and thus the circuit court erroneously entered judgment in Liberty's favor on the section 155 count. We again reject this contention.

¶ 61    The parties herein filed cross-motions for summary judgment. Where parties have filed cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record. *Evergreen Real Estate Services*, 2019 IL App (1st) 181867, ¶ 16; *Morningside North Apartments I, LLC v. 1000 N. LaSalle, LLC*, 2017 IL App (1st) 162274, ¶ 11. We recognize that the filing of such cross-motions does not establish that there are no genuine issues of material fact or obligate a court to render summary judgment.

*Id.* In the instant case, however, for the reasons discussed above, we find that there are no genuine issues of material fact as to whether Liberty's coverage denial was vexatious and unreasonable. Among other things, the existence of a *bona fide* dispute precludes the plaintiff's recovery under section 155 as a matter of law.

¶ 62 We further observe that even if the circuit court ultimately determines that Liberty violated the policy by improperly denying coverage under the remaining breach of contract count, "[a]n insurer is not liable for a violation of section 155 when it takes a reasonable but erroneous position on its coverage obligations where its position is at least arguable," as is the case herein. *Evergreen Real Estate Services*, 2019 IL App (1st) 181867, ¶ 38. See also *McGee*, 315 Ill. App. 3d at 681 (noting that an insurer does not violate section 155 "merely because it unsuccessfully litigates a dispute involving the scope of coverage or the magnitude of the loss"). Accord *Uhlich Children's Advantage Network*, 398 Ill. App. 3d at 723. As the circuit court accurately observed in its order denying the motion for reconsideration, "[w]hether Liberty's coverage defense is valid is a question properly raised in accordance with the breach of contract claim, not the bad faith claim."

¶ 63 The plaintiffs cite *St. Paul Mercury Insurance Co. v. Foster*, 268 F. Supp. 2d 1035, 1049 (C.D. Ill. 2003), for the proposition that summary judgment on their section 155 claim is not appropriate at this stage of the litigation. Not only is this federal district court holding not precedential or binding (*County of Du Page v. Lake Street Spa, Inc.*, 395 Ill. App. 3d 110, 122 (2009)), but also the Illinois Appellate Court has expressly found that "[w]here there is a *bona fide* dispute concerning coverage, the assessment of costs and statutory sanctions is inappropriate, even if the court later rejects the insurer's position." *Dominick's Finer Foods v. Indiana Insurance Co.*, 2018 IL App (1st) 161864, ¶ 94.

¶ 64                                        CONCLUSION

¶ 65      For the reasons discussed herein, we find, as a matter of law, that Liberty did not act

vexatiously or unreasonably in denying coverage to the plaintiff for the Nevada litigation under

the D&O policy.  We thus affirm the circuit court's grant of summary judgment in favor of

Liberty and denial of the plaintiffs' motion for summary judgment as to the bad faith count

(count V) of the complaint.  Nothing in this opinion is intended to constitute an assessment of the

merits of the plaintiffs' remaining claim for breach of contract (count IV).

¶ 66      Affirmed.

_____

No. 1-19-0320

_____

| | |
|---|---|
| **Cite as:** | *Nine Group II, LLC v. Liberty International Underwriters, Inc.*, 2020 IL App (1st) 190320 |

_____

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13 CH 25124; the Hon. Franklin U. Valderrama, presiding. |

_____

| | |
|---|---|
| **Attorneys for Appellant:** | William J. Quinlan, Lisa H. Quinlan, Sam Royko, and Kamil Z. Merchant, of The Quinlan Law Firm, LLC, for appellants. |

_____

| | |
|---|---|
| **Attorneys for Appellee:** | Robert Marc Chemers and William W. Elinski of Pretzel & Stouffer Chartered |

_____